IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LESTER SMITH,                          )
                                       )
            Plaintiff,                 )
                                       )        No. 13 CV 5433
vs.                                    )
                                       )        Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting              )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Lester Smith seeks reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI") (doc. # 18). The Commissioner opposes the motion and seeks affirmance of the decision denying benefits (doc. # 23). For the following reasons, we grant Mr. Smith's motion and remand the case for further consideration.

### I.

We begin with the procedural history of this case. Mr. Smith applied for DIB and SSI on January 27, 2011 alleging asthma, right ankle injury, depression, and a lumbar strain as his various disabilities (R. 213). Mr. Smith originally set July 19, 2006 as his

---

[1] On August 26, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 9).

alleged onset date, but he later stated at the hearing before the Administrative Law Judge ("ALJ") that he wanted to amend this date to October 24, 2010—his 50th birthday (R. 66-67). The application was denied initially and upon reconsideration (R. 68-71). Thereafter, a hearing was held before ALJ David Skidmore on April 4, 2012 (R. 37-67). The ALJ issued an unfavorable decision on April 26, 2012, finding that Mr. Smith is not disabled (R. 18-30). The Appeals Council then denied Mr. Smith's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-4). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We proceed with a summary of the administrative record. Part A briefly sets forth Mr. Smith's background, followed by his physical and mental health medical record in Part B. Part C discusses the testimony provided at the hearing before the ALJ, and Part D sets forth the ALJ's written opinion.

## A.

Mr. Smith was born on October 24, 1960 (R. 42). He is a divorced father of four and currently lives with his mother and sister (R. 43). He did not graduate from high school (R. 267). Between 1990 and 2008, he worked numerous unskilled jobs that included work as a laborer, mason, bicycle messenger, hotel porter, butcher, and janitor (R. 197, 214, 219). Mr. Smith has not engaged in substantial gainful activity ("SGA") since 2006 as the jobs he held after this date failed to yield earnings sufficient to meet the SGA threshold (R. 20).

**B.**

The objective medical record, which is very sparse, begins in August 2006 when Mr. Smith broke his ankle during a fight. Medical records from Stroger Hospital indicate that Mr. Smith underwent open reduction internal fixation surgery of his right tibia and distal fibula on August 7, 2006 (R. 293). At a follow-up doctor's appointment on August 24, 2006, the examining doctor observed that Mr. Smith's leg was healing, with no swelling of his right leg or ankle, and an "active FROM [full range of motion]" (*Id.*). The doctor's plan was to "remove staples and sutures" and have Mr. Smith return in four weeks (*Id.*). An X-ray on September 21, 2006 showed no "displacement of [the] fracture" and the "screws [and] plates intact" (R. 294). The attending physician, Dr. James Kapotas, noted that Mr. Smith's incision site was well-healed, although Mr. Smith complained of painful range of motion (*Id.*). Dr. Kapotas referred Mr. Smith to physical therapy and told him to return in three weeks (*Id.*).

During a physical therapy consultation at Stroger Hospital on October 23, 2006, medical staff placed no restrictions on Mr. Smith's ability to bear weight on his right leg (R. 295). However, at a follow-up physical therapy session on December 1, 2006, Mr. Smith complained of pain on a scale of seven out of ten, an inability to do his therapy exercises, and continued use of crutches and/or a walker (R. 296). The physical therapists working with Mr. Smith noted that he had the potential for "good" rehabilitation, provided he complied with therapy, but that, to date, he had not been compliant (*Id.*). They stressed the need for Mr. Smith to continue with his home exercise program (*Id.*).

On December 7, 2006, Mr. Smith was seen for a follow-up by Dr. Richard Rhim, at which point he had been "weight-bearing as tolerated with a CAM boot and two crutches" for the previous six weeks (R. 298). This exam also showed some "minimal swelling which is expected postoperatively from this injury" (*Id.*). At that time, Mr. Smith also had "normal" foot sensation (*Id.*). An X-ray showed the hardware in his ankle was intact but "due to not loading this extremity for such a long period," Mr. Smith showed "radiographic evidence of osteopenia" (*Id.*).[2] Dr. Rhim's plan at that point was for Mr. Smith to discontinue use of the CAM boot and crutches over a period of three weeks and to follow-up in four weeks (*Id.*).

A substantial gap in the medical record of more than three years follows these initial reports. On February 19, 2009, Mr. Smith had an X-ray as ordered by Dr. Kapotas (R. 300). The X-ray showed "fixation right tibia and fixation plate tibia," and noted that the findings of the X-ray were similar to those from a study, otherwise unidentified, that was performed on November 1, 2007 (*Id.*). The next medical record entry is nearly two years later, on January 5, 2011, when Mr. Smith was seen at Stroger Hospital for two tooth extractions (R. 276). Finally, the record contains a single medical notation from May 18, 2011, when Mr. Smith sought care at Stroger Hospital for ongoing right knee and ankle pain (R. 302).

The record also contains medical opinions from various consultative examiners. Dr. Fauzia Rana of Lake Shore Medical Clinic examined Mr. Smith on March 22, 2011

---

[2]"Osteopenia refers to bone density that is lower than peak density but not low enough to be classified as osteoporosis." *See* www.webmd.com/osteoporosis/tc/osteopenia-overview

(R. 282). Mr. Smith provided Dr. Rana with a history but no medical records to review (*Id.*). Mr. Smith complained of lifelong asthma but stated that he had never been hospitalized for shortness of breath and had no history of emergency room visits for IV medication or breathing treatments (*Id.*). He complained of breathing difficulty on a daily basis, mainly on exertion and upon a change of weather (*Id.*). Mr. Smith also complained of intermittent pain and swelling of the right ankle since his 2006 surgery, as well as aching pain in his lower back (*Id.*). He stated that an X-ray taken about a year earlier showed evidence of arthritis (*Id.*). Mr. Smith indicated that he smokes half a pack of cigarettes a day and uses a Qvar inhaler and a Proventil inhaler (*Id.*).

Dr. Rana then examined Mr. Smith and noted that he is grossly obese but "has no difficulty in breathing and has no difficulty in any movement" (R. 282). The doctor noted clear lungs, with no rales, rhonchi or wheezing (R. 283). She noted that Mr. Smith walks with a limp that favors his right leg but that he uses no ambulatory aid and can walk more than 50 feet unassisted (R. 284). Mr. Smith had mild swelling in his right ankle, but Dr. Rana did not observe any warmth, redness, or tenderness (*Id.*). Dr. Rana observed Mr. Smith had "difficulty walking on heels and toes on the right foot" but had "no complaint of pain on movement" (*Id.*). Although Mr. Smith was unable to hop on one leg and had mild difficulty tandem walking, walking on toes and heels, and squatting and arising, he had no difficulty getting on or off the exam table (*Id.*). Dr. Rana's diagnostic impressions included "chronic obstructive and restrictive lung disease," "post traumatic degenerative arthritis—right ankle," and "gross obesity" (R. 284-85). Dr. Rana also noted that Mr. Smith was "able to sit, speak, and hear without difficulty" but that he

has "some difficulty in prolonged standing, walking, lifting and carrying due to right leg pain and obesity" (R. 285).

Dr. Ana Gil conducted a psychiatric examination on March 22, 2011 that we summarize only briefly since Mr. Smith's mental status is not at issue on appeal. Dr. Gil's report is the only psychiatric evidence in the record and indicates that Mr. Smith has no psychiatric records and no prior psychiatric treatment (R. 278-81). Mr. Smith reported to Dr. Gil that he had "some feelings of hopelessness, helplessness and anhedonia," as well as decreased energy and motivation (R. 278). He "denied any suicidal or homicidal ideation, intent or plan, auditory, visual or tactile hallucinations or feelings that people want to hurt or want to harm him" (*Id.*). Mr. Smith complained of some difficulty with activities of daily living related to pain symptoms and of "feeling pretty bad and pretty hopeless" because he is not working (R. 279-80). However, during the exam Mr. Smith was cooperative with good eye contact and was alert and oriented to time, place and person, engaging, friendly, polite, and related well during the examination (R. 279). Dr. Gil diagnosed Mr. Smith with "adjustment disorder with depressed mood" (R. 281).

Mr. Smith also filled out a function report in connection with the filing of his claim (R. 244-52). Here, Mr. Smith stated that he suffers depression on account of "not having a whole body" due to osteoarthritis and his leg injury (R. 244). He indicated that he struggles to dress, bathe, use the bathroom, clean, walk, bend or stand on account of his injured leg (R. 245). He is able to help his mother, prepare quick meals, do light housework like sweeping and mopping, but often needs to sit on a stool while doing so (R. 245-47). He stated he is able to walk approximately 50 to 100 feet before he needs to

rest (R. 249), and that he uses a cane "almost all the time" (R. 250). Since his injury, Mr. Smith frequently feels isolated and depressed (R. 249).

Several Department of Disability Services ("DDS") physicians reviewed Mr. Smith's medical records (R. 76-78). Kirk Boyenga, Ph.D., completed a Psychiatric Review Technique Form on April 11, 2011. He noted that Mr. Smith had mild restrictions in activities of daily living, social functioning, and concentration, persistence, or pace, but found that he had "no mental medically determinable impairments" (R. 77).

Dr. Francis Vincent evaluated Mr. Smith's medical file on April 14, 2011, which included the consultative reports of Dr. Rana and Dr. Gil (R. 81-89). Dr. Vincent found "insufficient medical record evidence on or before the DLI [date last insured] of 09/30/2009 to make a medical decision on the [DIB] portion of this case" (R. 85). Regarding the SSI portion of Mr. Smith's claim, Dr. Vincent concluded that Mr. Smith's claimed symptomology was only partially credible, that his current physical status was "non-severe," and that he is capable of unskilled, sedentary work (R. 85, 87). More specifically, Dr. Vincent found that Mr. Smith "has some limitations in the performance of certain work activities; however, these limitations would not prevent [him] from performing past relevant work as a/an Line Tech Assistant," which his assessment designated as a sedentary job (R. 88).

At the reconsideration level, on September 20, 2011, Dr. Richard Bilinsky affirmed Dr. Vincent's prior determination (R. 90-97). In making that determination, Dr. Bilinsky had the benefit of additional information that Mr. Smith had experienced knee swelling since April 2011 (R. 93). However, Dr. Bilinsky noted that Mr. Smith had not sought additional medical care since April 2011 (*Id.*). Like Dr. Vincent, Dr. Bilinsky

concluded that Mr. Smith was capable of sedentary work as a Line Tech Assistant (R. 95-96).

**B.**

On April 4, 2012, the ALJ conducted a hearing at which Mr. Smith and his counsel were present and only Mr. Smith testified (R. 37-67).[3] The ALJ began the hearing by noting that Mr. Smith's DLI of September 9, 2009 meant that he had to prove an inability to work by that date in order to prevail on his DIB claim (R. 38). At the end of the hearing, Mr. Smith formally amended his onset date to October 24, 2010, which is the date of his 50th birthday (R. 66-67).

Mr. Smith was 51 years old at the time of the hearing (R. 42). Mr. Smith testified that he lives with his mother and sister (R. 43). He stated that he does not have any current sources of income except food stamps and that his sister is the breadwinner of the house (R. 44). He lives in a home that has about 14 stairs that he can climb, provided he takes his time and leads with his right foot (R. 42-43). Mr. Smith stated that he does not have a driver's license but is able to drive, although not for long periods of time on account of his ankle (*Id.*). He feels like his ankle operates at about "65 percent" and he can feel some of the screws working their way out (R. 46). He also said he is unable to play sports like football (*Id.*).

When describing his leg pain, Mr. Smith testified that he feels discomfort in his knee and ankle when standing and sitting (R. 47-48). He stated that his right leg "swells up" when he is in a cold environment and that it gets "aggravate[d]" when he is not in a

---

[3]Richard Hamersma, Ph.D., was present at the hearing in his capacity as a vocational expert but did not testify (Pl.'s Br., doc. # 18, at 4 n.2).

cold environment (R. 53). He also feels a difference between his left and right leg in the cold (R. 53). To alleviate the pain, Mr. Smith said he takes four to six tablets of over-the-counter pain medication, such as ibuprofen (R. 49-50, 57-58). Mr. Smith elevates his leg when he is at home, which he believes helps with circulation (R. 54-55). He also wears a "house shoe" on his right foot (*Id.*).

On the day of the hearing, Mr. Smith described walking six blocks from the train to the location of the hearing, stopping periodically at stop signs and to look at buildings he recognized from when he was a bicycle messenger (R. 48). He testified that he knew he could do the walk "mentally" but that physically he had to "force[ ]" himself to do it (R. 49).

Mr. Smith also testified that he has asthma and needs an asthma pump, but at the time of the hearing did not have one (R. 51). He said he was born with asthma but believed he had outgrown it because he has not had any problems with it (R. 52). He learned he still has the disease when he did tests in advance of his 2006 ankle surgery (*Id.*).

When asked about his mental health, Mr. Smith said that he suffered some depression after his injury in 2006 (R. 50). He said that he sometimes feels "aggravated" but has a "stable environment" and is able to see his family since he no longer travels for work (R. 50-51).

Mr. Smith has been unemployed since 2009 (R. 44). He said he has never held a job for which he had to sit down (R. 56). Prior to his injury in 2006, he worked as a loader at UPS (R. 56). After his injury, he worked jobs in construction, on a receiving line at Tyson's, as a janitor, and as a line packer at Scott's Lawn Care (R. 44-45, 59-60).

At Tyson's, Mr. Smith stood on a line and was responsible for taking off specific animal parts (R. 59). He described the difficulty he had standing up for long periods and working in cold temperatures (*Id.*). At Scott's Lawn Care, Mr. Smith described doing "light" duty, which included walking and some lifting (R. 61). He described himself as the person who brought utensils to other people and who would fill-in for other workers when they were on break (R. 65-66). He also lifted boxes off a pallet, some as heavy as 50 to 60 pounds, but stated that this work was difficult because he had to bend in order to lift the boxes and this affected either his back or his legs (R. 60). He said he could pack for two hours at the most but could not stand still for two hours (R. 47). He said he had difficulty even with light duty work and eventually was let go from his position (R. 62).

Most recently, in 2009, Mr. Smith worked in construction (R. 44, 62).[4] He described being able to put up drywall or paint but was unable to do anything on his knees (R. 44). Mr. Smith described a "typical" construction worker as being able to carry a whole sheet of drywall up the stairs by himself, but that he has been unable to do so since his injury and now needs help from someone to hold the other end (R. 63). He said it was difficult to work as a painter in cold weather, and that his knee and ankle would swell and go numb (R. 45-46). He said that currently he would be able to paint but could not reach the bottom trim and would be unable to install flooring (R. 63-64).

## C.

On April 26, 2012, the ALJ issued a written decision finding Mr. Smith not disabled and accordingly denying him benefits (R. 15-30). In evaluating Mr. Smith's

---

[4]The income Mr. Smith made between 2007 and 2009 did not rise to the threshold level necessary to constitute SGA (R. 20).

claim, the ALJ applied the five-step sequential evaluation process for determining disability. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a). The process requires the ALJ to consider: (1) whether the claimant has engaged in any "substantial gainful activity" since the alleged disability onset date; (2) whether his impairment or combination of impairments is severe; (3) whether his impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) whether his residual functional capacity ("RFC") prevents him from performing past relevant work; and (5) whether his RFC prevents him from performing any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4), (b)-(f); 416.920(a). The claimant bears the burden of proof at Steps 1 through 4, after which the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

At Step 1, the ALJ determined that Mr. Smith has not engaged in substantial gainful activity since July 19, 2006, the initial alleged onset date (R. 20).[5] Although Mr. Smith engaged in work activity after that date, either the employment income did not rise to the level of SGA or the income went unreported and was therefore not listed in his records (*Id.*).

At Step 2, the ALJ found that Mr. Smith had one severe impairment: "right ankle arthritis status post fracture" (R. 20). The ALJ concluded that Mr. Smith's "asthma, adjustment disorder with depressed mood, and obesity are not severe impairments" as they did not have more than a *de minimis* effect on his ability to perform basic work activities (R. 21).

---

[5]At the hearing, Mr. Smith amended his onset date to October 24, 2010 (R. 66-67). However, the ALJ did not amend the onset date in his opinion.

At Step 3, the ALJ found that Mr. Smith does not have an impairment or combination of impairments that meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 22). Mr. Smith described at the hearing how he was able to walk six blocks to get to the hearing location, and that he did not use a walker or crutches (*Id.*). Nor did Mr. Smith meet the listing for asthma as the record bore no "evidence of repeated emergency room visits or multiple hospitalizations due to asthmatic exacerbations" (*Id.* at 22-23). As for Mr. Smith's obesity, the ALJ found that this factor did not elevate the other medical issues enough to otherwise meet a listing (R. 23).

The ALJ then determined that Mr. Smith has the RFC to perform a full range of medium work, as defined in the regulations. That means the ALJ found that Mr. Smith can lift up to 50 pounds occasionally and up to 25 pounds frequently, and can stand and walk for approximately six hours and sit for six hours during an eight-hour workday (R. 23).

At Step 4, the ALJ found that Mr. Smith had no relevant work history, and thus made no determination as to whether Mr. Smith's RFC allowed him to perform past relevant work (R. 28-29). At Step 5, the ALJ concluded that a finding of "not disabled" was directed by Medical-Vocational Rule 203.25 and Rule 203.18 considering Mr. Smith's age, education, and work experience (R. 29). Accordingly, the ALJ found Mr. Smith not disabled (*Id.*).

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision.

*Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and his conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Pepper*, 712 F.3d at 362. In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Mr. Smith contends that the ALJ erred in two ways in determining that he has an RFC to perform medium work: (1) by improperly weighing the medical opinion evidence in formulating his RFC; and (2) by failing to adequately address the effect of Mr. Smith's morbid obesity on his severe right ankle impairment. For the reasons stated below, we agree that the ALJ failed to sufficiently support his decision and we accordingly remand.

## A.

Mr. Smith first argues that the ALJ improperly weighed the opinion evidence of Dr. Rana in formulating the RFC. (Pl.'s Br., doc. # 18, at 8-10). He notes that the ALJ stated that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision" (R. 28). Mr. Smith argues that the ALJ erred in so stating because "Dr. Rana opined that Smith has 'some difficulty in prolonged standing, walking, lifting and carrying due to right leg pain and obesity'" (Pl.'s Br. at 9). Mr. Smith also points to the fact that Dr. Rana's "examination revealed swelling of Smith's right ankle, decreased range of motion of his hips and right ankle, and decreased muscle

strength in his right leg" to support his attack on the ALJ's analysis (*Id.*). He accuses the ALJ of "misunderstanding" or "mischaracterizing" Dr. Rana's opinions and asks this Court to conclude that these statements in Dr. Rana's report show "the ALJ's decision lacks substantial evidence and defies meaningful review" (*Id.* at 8, 10).

In response, the government argues that "no doctor, including doctor Rana, opined that Plaintiff had *any* specific functional restrictions, let alone that he could only stand for less than approximately six hours per day" (Def.'s Resp., doc. # 23, at 3) (emphasis in original). Further, the government argues that "the ALJ also gave great weight to the state agency doctors' opinions—the only medical opinions quantifying Plaintiff's functioning—which both agreed that Dr. Rana's report showed that Plaintiff had the physical capacity to work at *any* exertional level" (*Id.*) (emphasis in original).

We begin by noting that the determination of a claimant's RFC is a matter reserved to the ALJ. *See Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir. 1995); *see also* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). The RFC determination represents the maximum a claimant can do, despite his limitations, on a "regular and continuing basis," which means roughly eight hours a day for five days a week. *See Pepper*, 712 F.3d at 362; *see also* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). To arrive at an appropriate RFC, the ALJ "must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Diaz*, 55 F.3d at 306 n.2. An ALJ is not bound by the findings of state medical or psychological consultants and "need not accept only physicians' opinions." *Id.* However, because the state agency doctors are experts in Social Security disability

evaluation, ALJs must consider their findings and opinions, except for the ultimate decision of whether the claimant is disabled. 20 C.F.R . § 404.1527(e)(2)(i).

Here, the ALJ determined that Mr. Smith has the capacity to perform medium level work, meaning that he can stand for six hours of an eight hour work day and lift up to 50 pounds. In support of this determination, the ALJ cited the following evidence: (1) in 2008, Mr. Smith worked for Scott's Lawn Care as a line packer and was able to lift 50 to 60 pound boxes off of a pallet; (2) Mr. Smith was able to walk six blocks to the hearing; (3) the medical record is extremely limited and includes very few trips to the doctor and thus does not support Mr. Smith's allegations of severe pain; (4) Mr. Smith walks with a limp but does not need a cane or other ambulatory aid; (5) Dr. Rana's report fails to support Mr. Smith's allegations as he demonstrated no difficulty with any movement and could walk more than 50 feet unassisted; and (6) the record fails to contain any opinions from treating or examining physicians indicating that Mr. Smith is disabled or that he has limitations greater than those determined in the decision (R. 22, 24-28). The ALJ concluded that although Mr. Smith has a severe impairment, it is "fully accommodated" by the RFC of medium work (R. 28).

The Social Security regulations define medium work as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c). Policy Statement SSR 83-10 further elaborates upon medium work as follows:

> *Medium work*. The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of

the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.

*The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity.* (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semiskilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

SSR 83-10, 1983 WL 31251, at * 6 (1983) (emphasis added).

Mr. Smith testified that he cannot do anything on his knees, particularly his right knee (R. 44). He stated that "[a]s far as doing anything on the floor, the ankle's not, and the knee is not, going to have it" (R. 45). He testified that he tried to go back to construction work in 2009, but that he could not bend his knee or ankle (R. 62). He stated that while working a packing job at Scott's Lawn Care, he had to unload 50 to 60 pound boxes off of a pallet and that "the problem was that [he] had to do it on a bend" which then affected the back and/or legs (R. 60). Mr. Smith stated that he did not believe he could be on his feet, standing still for two hours, because of his ankle (R. 47-48). Finally, he stated that he could not paint an entire wall on his own because he could not get on his knees to tape off the trim (R. 63-64).

The ALJ noted repeatedly in his opinion that Mr. Smith described difficulty with bending and crouching during his work at Scott's Lawn Care and other jobs that followed his 2006 surgery (R. 24). Nevertheless, the ALJ minimized the significance of this

limitation when assigning Mr. Smith an RFC of medium work, stating that Mr. Smith only complained about bending and not about an inability to lift heavy boxes (*Id.*). The implication of these statements is that Mr. Smith would be fine performing medium work because he is able to lift heavy boxes. But we find the ALJ's focus on lifting alone, without any consideration of any limitation on bending/crouching, to be at odds with SSR 83-10, which expressly states that medium work requires frequent bending and stooping, as well as flexibility of the knees.

We also find problematic the ALJ's assertion that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision" (R. 28). The record does not contain an assessment of Mr. Smith's RFC, and no medical provider otherwise determined that Mr. Smith is capable of medium work. Despite the government's assertion that Drs. Vincent and Bilinsky interpreted Dr. Rana's report to mean that Mr. Smith could work at any exertional level (Def.'s Resp. at 3), we disagree that the medical record supports this conclusion. Dr. Rana, who examined Mr. Smith (unlike Drs. Vincent and Bilinsky), found Mr. Smith limited in his ability to withstand prolonged activity. Drs. Vincent and Bilinsky, for their part, concluded that Mr. Smith's physical and mental status was "non-severe," that he was capable of unskilled work, and that he could perform past relevant work as a Line Tech Assistant, which they designated as sedentary, not medium level, work (R. 76-80, 95-96). We do not view their reports, or Dr. Rana's, as providing an endorsement of Mr. Smith's ability to perform work at any exertional level, and the ALJ offered no explanation of why they reasonably should be read that way.

Furthermore, we will not affirm the ALJ's conclusion that Mr. Smith is able to perform medium work where, as here, the ALJ failed to adequately articulate how he arrived at this designation. The ALJ recites, but does not assess, Dr. Rana's conclusion that Mr. Smith has "some difficulty in prolonged standing, walking, lifting, and carrying due to right leg pain and obesity," despite stating that he expressly gave Dr. Rana's opinion "great weight" (R. 28). We have no basis for knowing why the ALJ did not give greater consideration to Dr. Rana's conclusion before assigning a medium work RFC because the ALJ did not explain how he concluded that having some difficulty in "prolonged standing, walking, lifting, and carrying" squared with the ability to perform medium work that is defined as requiring standing and walking as much as six hours a day and lifting up to 25 pounds frequently. *See Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (finding that an ALJ must provide a logical bridge between the evidence in the record and her conclusion); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (finding that "[a]lthough the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected").

We also note that, in this case, the ALJ's decision reflected the view that Mr. Smith could perform medium work in part because of his ability to walk to six blocks to the hearing, to help care for his mother, and to complete numerous activities of daily living such as light house work and meal preparation (R. 22). The Seventh Circuit repeatedly has commented on the danger of too readily equating an ability to complete activities of daily living with an ability to do full-time work. In *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012), the appeals court stated that there is a critical difference

between activities of daily living and activities of a full-time job. With the former, "a person has more flexibility in scheduling . . . than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Id.*; *see also Gentle v. Barnhart,* 430 F.3d 865, 867–68 (7th Cir. 2005) (finding ALJ's analysis deficient in case involving a claimant with spinal disk disease where the ALJ equated the claimant's ability to take care of her children with an ability to perform non-sedentary, full-time work that required much standing); *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011) (reversing ALJ's finding where ALJ did not identify any medical evidence to substantiate her belief that the claimant could stand for 6 hours or lift up to 20 pounds: claimant's testimony that she could walk 2 blocks hardly demonstrated an ability to stand for 6 hours).

**B.**

Next, Mr. Smith argues that the ALJ erred by only providing "boilerplate assurances that he considered Smith's obesity" and that this analysis defies meaningful review. (Pl.'s Br. at 10). He accuses the ALJ of making "opaque references to Smith's morbid obesity" and suggests that in doing so, the ALJ committed reversible error by ignoring an "evidentiary conflict" (*Id.* at 12). Mr. Smith also contends that "[t]he ALJ's conclusory obesity analysis is directly contradicted by Dr. Rana's opinion" because she opined that Mr. Smith has limited "tolerances as a result of the combination of 'right leg pain *and* obesity'" (*Id.*) (emphasis in original).

In response, the government argues that the ALJ relied on opinion evidence from the DDS consultants "who specifically noted that Dr. Rana's finding of gross obesity nonetheless caused no significant physical restriction" (Def.'s Br. at 5). Additionally, the government claims the ALJ specifically considered Mr. Smith's obesity throughout the decision (*Id.*).

We conclude that the ALJ gave Mr. Smith's obesity short shrift by failing to fully consider its impact upon his severe right ankle impairment, as required by the regulations. *See* SSR 02-01p; *Arnett v. Astrue,* 676 F.3d 586, 593 (7th Cir. 2012) (ALJs must consider obesity when determining the aggregate impact of a claimant's impairments and "must explain its decision such that it can be meaningfully reviewed"); *Clifford v. Apfel,* 227 F.3d 863, 873 (7th Cir. 2000). At the time of the hearing, Mr. Smith stood at 5 feet 6 inches tall and weighed 269 pounds (R. 27). This equates to a body mass index ("BMI") of 44.8, which in turn places Mr. Smith in the category of morbid obesity. *See* www.urmc.rochester.edu/highland/Bariatric-Surgery-Center/Questions/morbid-obesity. In his decision, the ALJ noted Mr. Smith's height and weight and then stated as follows:

> I acknowledge that the claimant's obesity affects his overall health including the above-listed impairments. Thus, I also considered this in formulating the appropriate residual functional capacity and find the additional restrictions included in the residual functional capacity assessment more than accommodate his obesity (R. 27).

We do not find this cursory statement to be adequate under the circumstances of this case. At 269 pounds, it would be reasonable to expect that Mr. Smith's weight could have an effect on his surgically reconstructed ankle. And, in fact, Dr. Rana opined that his obesity in conjunction with his ankle condition created "some difficulty" in

prolonged standing, walking, lifting and carrying (R. 285)—which are central to being able to perform medium work as defined in the regulations. The ALJ's conclusory statement sheds no light on how an unadjusted medium RFC would "more than accommodate[ ]" the combined effect of Mr. Smith's ankle condition and obesity.

As noted by the Seventh Circuit in *Gentle v. Barnhart*, 430 F.3d at 868, while sometimes "obesity or some other health condition merely aggravates a disability caused by something else; it still must be considered for its incremental effect on the disability." The appeals court gave the example of two women, both standing 5 feet 11 inches tall and with disk disease of equal severity, but with one woman weighing 150 pounds and the other 275 pounds. *Id.* The appeals court noted that "[t]he effect of the disk disease on ability to stand, sit, etc., for protracted periods is likely to be different in the two cases by virtue of the difference in weight. So in considering the credibility of the obese woman's narrative of her ability to stand, sit, etc., the administrative law judge would have to determine the effect of her obesity on that ability." *Id.* Here, the ALJ's treatment of Mr. Smith's obesity as it relates to his ankle and then his ability to stand for protracted periods of time and lift as much as 50 pounds was inadequate and prevents meaningful review by this Court.

## C.

Finally, we have an important house-keeping issue to point out that requires consideration on remand. At the hearing, Mr. Smith amended his onset date to his 50th birthday, October 24, 2010 (R. 66-67). The ALJ took note of this and stated that he would amend the onset date to reflect this change (R. 67). However, in the ALJ's opinion, the onset date remained at July 19, 2006. We observe that by amending his

onset date to after his DLI, Mr. Smith effectively dismantled his DIB claim. The government pointed this out in its response brief, and Mr. Smith conceded the point in his reply brief (Def.'s Resp. at 3, Pl.'s Reply, doc. # 24, at 1). This concession should control on remand.

CONCLUSION

For the reasons set forth above, the Court grants Mr. Smith's motion for a remand of the Commissioner's decision.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

Dated: **January 23, 2015**